**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ORTHOVITA, INC.,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff** | : | |
| | : | **NO. 07-2395** |
| **v.** | : | |
| | : | |
| **ERIK M. ERBE,** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM AND ORDER</u>**

GENE E.K. PRATTER, J.                                                              FEBRUARY 14, 2008

Employee loyalty and post-employment competition against the former employer spawn many disputes.  This is one of them.

Orthovita, Inc., a company in the medical technology field, asserted thirteen claims[1] against its former Chief Science Officer, Dr. Erik M. Erbe.  As described in greater detail in this Memorandum, Orthovita believes Dr. Erbe's disloyal conduct while in the company's employ was so extensive as to justify a host of claims, subjecting him to both money damages and equitable remedies.

Dr. Erbe has moved to dismiss all the claims against him except the claims for breach of contract and for violation of the Computer Fraud and Abuse Act.  Dr. Erbe argues that (1) the

---

[1]The array of claims is as follows: breach of contract (Count I), misappropriate of trade secrets – common law (Count II), misappropriation of trade secrets – 12 Pa. C.S.A. § 5302 (Count III), inevitable disclosure (Count IV), unfair competition (Count V), trademark infringement – 15 U.S.C. § 1125 (Count VI), violation of § 32 of the Lanham Act – 15 U.S.C. § 1114 (Count VII), promissory estoppel (Count VIII), conversion (Count IX), breach of fiduciary duty (Count X), violation of the Computer Fraud and Abuse Act – 18 U.S.C. § 1030 (Count XI), breach of duty of loyalty (Count XII), and fraud (Count XIII).

gist of the action doctrine requires dismissal of Counts II-V, IX, X, XII and XIII; (2) Counts II, III, IV and V are not viable and lack necessary supporting factual allegations; (3) Counts VI and VII (trademark infringement) must fail because Dr. Erbe has not used Orthovita's CORTOSS product name in marketing products or in any manner that could confuse potential investors or buyers; (4) Count VIII (promissory estoppel) must be dismissed because neither party disputes the existence of a valid employment contract; and (5) Count X (breach of fiduciary duty) must be dismissed because Pennsylvania law does not impose such a duty on corporate officers or employees.

For the reasons set forth below, Dr. Erbe's Motion to Dismiss is granted as to Counts V (unfair competition) and X (breach of fiduciary duty), but denied in all other respects.

## I.      LEGAL STANDARD

To decide a Rule 12(b)(6) motion, the Court may look only to the facts alleged in the complaint and its attachments.  Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1251, 1261 (3d Cir. 1994).  The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff.  Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).  A Rule 12(b)(6) motion will be granted only if it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff.  Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).

II.     **FACTUAL BACKGROUND**

**A. Orthovita and Its Products**

Orthovita, a Pennsylvania corporation, develops, manufactures and markets high-tech,

synthetic-based biomaterial products for use in spinal surgery.  Orthovita has five key

commercial product groups: VITOSS Bone Graft Substitute, VITAGEL Surgical Hemostat,

CORTOSS Bone Augmentation Material, ALIQUOT Delivery System, and IMBIBE Needles,

Syringes and Disposable Delivery Systems.  All of its products are regulated by the U.S. Food

and Drug Administration ("FDA").

CORTOSS, the product at the center of this litigation, is a glass ceramic polymeric

composite engineered specifically to mimic the characteristics of human bone.  According to

Orthovita, CORTOSS may be used in surgical procedures to aid in the repair of bones, including

the spine.  Orthovita's CORTOSS trademark received federal protection on November 5, 2002 in

connection with bioactive bone augmentation material.

**B. Dr. Erbe's Employment with Orthovita**

Orthovita hired Dr. Erik Erbe as Director, Technical Operations on May 22, 1995.  In

October of 1996, Orthovita promoted him to the position of Vice President, Research and

Development.  Orthovita again promoted Dr. Erbe on May 1, 2002, when he became Chief

Science Officer overseeing research and development for all Orthovita products, preparing patent

applications, and testifying as an expert witness regarding Orthovita products.  Orthovita asserts

that in this role, Dr. Erbe had access to the company's research and development plans, testing

procedures, and patent prosecution strategies.

On April 23, 2003, Dr. Erbe entered into an employment agreement with Orthovita.   See, Amended Compl., Ex. A.  The agreement required Dr. Erbe to maintain the confidentiality of the company's business.  It included provisions related to confidential information, intellectual property, and non-competition.  In addition, the agreement required that Dr. Erbe provide Orthovita with all new ideas he had for undeveloped intellectual property.

### C. Behavior Prior to Dr. Erbe's Termination[2]

On the weekend of April 29, 2007, Dr. Erbe called an "urgent" meeting with Charanpreet Bagga, Dr. Joshua D. Auerbach, and Dr. Philip Maurer[3] to discuss his plans for a company called Augmented Spinal Technologies ("AST").  According to Orthovita, Dr. Erbe planned to incorporate AST and use the new company to develop and/or market a bioactive bone augmentation material similar to CORTOSS in competition with Orthovita.

During the meeting, Dr. Erbe showed a PowerPoint presentation that Orthovita asserts was largely copied from its corporate materials.  Dr. Erbe presented a detailed plan for developing AST's business, including information about the products it will develop and market. The presentation materials used the word "CORTOSS" in relation to Dr. Erbe's description of

---

[2] Orthovita asserts that the initial decision to terminate Dr. Erbe's employment was based on his lack of loyalty to the company as demonstrated by his repeatedly missing work in May 2007, his failure to affirmatively contribute to a May 14, 2007 management meeting, and his preoccupation with royalty payments.  Orthovita discovered Dr. Erbe's additional alleged disloyal activities (i.e. alleged meetings with representatives from competitors and potential AST investors) *after* giving him 30 days' notice as called for under his employment contract.

[3] Mr. Bagga is Orthovita's former Vice President of Product Development.  He worked on the development of CORTOSS and ALIQUOT products.  Drs. Auerbach and Mauer are orthopedic spine surgeons who serve as consultants to Orthovita and assist with product development.

plans regarding the development and marketing of bioactive bone augmentation material.  The PowerPoint also contained images found in Orthovita's Technical Information Package about CORTOSS.

Dr. Erbe then traveled to Berlin, Germany to attend a meeting, ostensibly on behalf of Orthovita.  While in Germany, on May 3, 2007, Dr. Erbe met with Bess Weatherman, a director of Kyphon, Inc., a direct competitor of Orthovita.  Prior to the meeting, Dr. Erbe told Ms. Weatherman that he wanted to discuss "confidential information" with her.  Amended Compl. ¶ 71.  During the meeting, Dr. Erbe showed Ms. Weatherman the same PowerPoint presentation. On the same trip, Dr. Erbe also met with Dr. Rudolph Bertagnoli, an orthopedic spine surgeon who serves as a consultant to Orthovita.  Dr. Erbe again showed the AST PowerPoint presentation.

Following his trip to Berlin, Dr. Erbe did not report to work on May 7-9 or May 11, 2007, although he went to work for a brief period on May 10.  Orthovita avers that instead of working Dr. Erbe met with various potential investors and medical advisors to present the AST PowerPoint.  Potential investors included Sean Carney of Warburg Pincus LLP, Richard Emmitt of The Vertical Group, and Susan Locktov and Mary Bowman, formerly of Bowman & Associates.   Orthovita asserts that during meetings with these individuals, Dr. Erbe revealed Orthovita's confidential information and trade secrets with respect to CORTOSS.

On May 8, 2007, accordingly to Orthovita, Dr. Erbe again spoke with Dr. Auerbach.  He sought information from Dr. Auerbach regarding the time line to secure intellectual property before proceeding with an anatomy study.

On May 14, 2007, Dr. Erbe attended a meeting regarding Orthovita's future goals.

Management analyzed and discussed CORTOSS's intellectual property, future development of CORTOSS, and steps for the development of Orthovita's intellectual property portfolio. Orthovita asserts that Dr. Erbe did not affirmatively contribute to the meeting.

Following this planning meeting, Dr. Erbe indicated that he was unhappy about issues concerning royalty payments he claimed he was due and that he anticipated that the company's Board of Directors would terminate his employment at its next meeting.

**D. Dr. Erbe's Computer Use**

Orthovita asserts that unbeknownst to the company at this time, Dr. Erbe engaged in a deliberate campaign of deleting from the Orthovita computer system files used in the normal course of the company's business. Further, Orthovita alleges that between November 2006 and May 2007, Dr. Erbe inserted 13 flash drives into his company laptop computer to copy Orthovita files. By using flash drives, after his termination Dr. Erbe was able to retain on his home computer Orthovita's proprietary formula for CORTOSS,[4] development plans and strategies, and Orthovita's operating procedures relating to the development, testing and manufacture of products.

While he was still a company officer, from March through May 2007, Dr. Erbe allegedly tried to hide his copying of files by deleting more than 5,500 files from his company laptop. In addition, some of the flash drives Dr. Erbe inserted into his computer were U3 Cruzer Micro USB flash drives. These drives use U3 technology, which is able to run software on computers so that once a file has been downloaded or deleted, no trace evidence/artifacts of the downloaded

---

[4]According to Orthovita, this formula is not in the public domain.

or deleted file will remain on the computer hard drive.

After his termination, according to Orthovita, Dr. Erbe allegedly delayed returning his laptop to Orthovita.

### E. Dr. Erbe's Termination

On May 16, 2007, Orthovita informed Dr. Erbe that his employment was terminated without cause pursuant to Section 5.4(a) of his employment agreement.  See, Amended Compl., Ex. A.  Because the agreement required 30 days notice prior to termination, Orthovita set the effective date for his termination as June 15, 2007.  Dr. Erbe continued to receive his full pay and benefits through that date.

The Amended Complaint alleges that Dr. Erbe's termination was the result of his failure to report for work May 7-9 and 11, 2007 and his lack of insight or contributions at the May 14, 2007 management meeting.  Amended Compl. ¶ 51.  See also, id. ¶¶ 45-53.  Orthovita avers that this behavior demonstrated Dr. Erbe's alleged lack of loyalty to the company and his inappropriate preoccupation with royalty payment issues.

On June 15, 2007, after learning the extent of Dr. Erbe's behavior prior to his termination (i.e. the multiple meetings with competitors and potential AST investors), Orthovita sent Dr. Erbe another notice of termination informing him of his termination for cause, effective immediately.

## III.    DISCUSSION

### A. Pennsylvania's Gist of the Action Doctrine

Dr. Erbe asserts that Pennsylvania's gist of the action doctrine supports dismissal of

Counts II-V, IX, X, XII and XIII.  He maintains that each of these counts presents a state tort

claim for conduct which, if proven, would violate specific provisions of the employment

agreement.  Therefore, according to Dr. Erbe, his alleged conduct justifies the breach of contract

claim in Count I, but renders the other specific counts redundant of the basic contract claim.  See,

Brief in Support of Def.'s Motion to Dismiss ("Motion") at 6.

Under the gist of the action doctrine, a plaintiff is barred from recasting a breach of

contract claim as a tort claim.  eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa.

Super. Ct. 2002).  The gist of the action doctrine bars tort claims:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly
> breached were created and grounded in the contract itself; (3) where the liability stems
> from a contract; or (4) where the tort claim essentially duplicates a breach of contract
> claim or the success of which is wholly dependent on the terms of a contract.

Id. at 19 (internal citations omitted).

"When a plaintiff alleges that the defendant committed a tort in the course of carrying out

a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist'

or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is

'collateral' to conduct that is primarily tortuous."  Caudill Seed & Warehouse Co, Inc. v. Prophet

21, Inc., 123 F. Supp.2d 826, 833 (E.D. Pa. 2000) (quoting Sunquest Info. Sys., Inc. v. Dean

Witter Reynolds, Inc., 40 F. Supp. 2d 644, 651 (W.D. Pa. 1999)).  "[I]f the claim essentially

alleges a breach of duties that flow from an agreement between the parties, the claim is

contractual in nature, whereas if the duties allegedly breached were of a type imposed on members of society as a matter of social policy, the claim is essentially tort-based." <u>Id.</u> (cited with approval by <u>Wilmington Fin., Inc. v. Am. One Fin., Inc.</u>, 2007 U.S. Dist. LEXIS 55738, at *6 (E.D. Pa. July 31, 2007)).

Notwithstanding the efficacy of the doctrine, a court should be slow to dismiss claims under the gist of the action doctrine.  Federal civil procedure allows parties to plead multiple claims as alternative theories of liability.  <u>See</u>, <u>e.g.</u>, <u>Berger & Montague v. Scott & Scott</u>, 153 F. Supp. 2d 750, 754 (E.D. Pa. 2001) (rejecting a challenge under the gist of the action doctrine and allowing a plaintiff to pursue claims for both breach of contract and conversion).  In fact, F.R.C.P. 8(e)(2) expressly states:

> A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses.  When two or more statement are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements.  A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

Fed.R.Civ.P. 8(e)(2).  "This permissive pleading rule has been applied to cases involving both contract claims and other claims related [to] the same facts." <u>Interwave Technology Inc. v. Rockwell Automation, Inc.</u>, 2005 U.S. Dist. LEXIS 37980, at *37 (E.D. Pa. December 30, 2005).

Dr. Erbe's invocation of the gist of the action doctrine requires that the Court consider the theories underlying Orthovita's various claims.

### i.     Counts II, III, IV and V – Misappropriation, Inevitable Disclosure, and Unfair Competition

Dr. Erbe asserts that Counts II, III, IV and V of the Amended Complaint (common law

misappropriation, statutory misappropriation, inevitable disclosure and unfair competition[5]) are all subsumed by the parties' contractual undertaking.  Dr. Erbe specifically points to paragraph 2.0 of his employment agreement, concerning "confidential information," to support this argument.  See, Amended Compl., Ex. A.  Dr. Erbe notes that the contract requires him to "maintain the secrecy of Orthovita's confidential and trade secret information for a period of three years after his termination from employment."  Motion at 8.  Thus, he argues that Counts II, III, IV and V all are merely variations of the contract claim that he violated paragraph 2.0 of the employment agreement.

### a.       Common Law and Statutory Misappropriation (Counts II and III)

Although Dr. Erbe argues that his duty to refrain from misappropriating trade secrets arises only through his employment contract, "Pennsylvania law...imposes a common law duty on an employee not to use or disclose trade secrets obtained in the course of a confidential employment relationship."  Freedom Med.. Inc. v. Gillespie, 2007 U.S. Dist. LEXIS 63720, at *65 (E.D. Pa. 2007).  Pennsylvania law also imposes such a duty by statute, 12 Pa.C.S.A. § 5302.

The Amended Complaint asserts that Dr. Erbe had "intimate" knowledge of Orthovita's inner workings and confidential strategies.  See, e.g., Amended Compl. ¶ 33. At this juncture in the litigation, it is too soon to know whether the common law or statutory prohibition against misappropriation will address a broader scope of Orthovita secrets or greater duties than the contract obligation.  Accordingly, when viewed in the light most favorable to Orthovita, the

---

[5] The Court does not analyze the unfair competition claim under the gist of the action doctrine because the Court has concluded that Count V fails to state a claim under even the most generous reading of Orthovita's pleading.  See, infra § III.B.

pleadings allege that Dr. Erbe had a confidential relationship with his former employer which, depending on the facts developed during the course of litigation, could "give rise to independent duties to refrain from disclosing or misappropriating trade secrets." Freedom Med., 2007 U.S. Dist. LEXIS 63720, at *66 (allowing a claim for misappropriation to move forward following a challenge under the gist of the action doctrine). Therefore, the Court will not apply the gist of the action doctrine to dismiss these Counts at this time.

   **b.      Inevitable Disclosure (Count IV)**

Orthovita asserts that Dr. Erbe had access to company trade secrets as a direct result of his employment. Accordingly, the company argues that it would be impossible for Dr. Erbe to work for AST or any other biomaterials company either as a direct employee or as a consultant without drawing directly from and using his knowledge of Orthovita's confidential information and trade secrets. Hence, the claim is that he will inevitably disclose Orthovita's confidential information.

Dr. Erbe asserts that his employment contract's confidentiality requirements fully protect Orthovita from any potential disclosure of the company's confidential information and trade secrets. Accordingly, Dr. Erbe seeks dismissal of Orthovita's inevitable disclosure claim under the gist of the action doctrine.

The Pennsylvania Supreme Court in Air Prods. & Chems., Inc. v. Johnson, 442 A.2d 1114, 1119-20 (Pa. Super Ct. 1982), recognized that the inevitable disclosure doctrine provides for an equitable remedy and does not emanate from a tort. This equitable remedy applies when there is no restrictive covenant in place to protect a former employer's trade secrets. Id. Orthovita asserts that certain of its trade secrets are not protected by the employment contract, so

the company is entitled, under <u>Air Products & Chemicals</u>, to invoke the inevitable disclosure

doctrine to protect those trade secrets and to prevent Dr. Erbe from working or consulting with

certain entities.  Indeed, Orthovita points to Dr. Erbe's Motion to support its argument that it may

not be fully protected by the employment agreement.  In his Motion, Dr. Erbe indicates that he

will contest the scope of the employment agreement.  <u>Compare</u>, Motion at 13, n.5 with Amended

Compl. ¶¶ 22, 43.  The possible reach of the agreement's purported restrictive covenant could

well be one of the points of contention Dr. Erbe may raise.  In addition, it is conceivable that the

alleged inevitable disclosure relates to information or circumstances not covered by the

employment agreement.  Thus, this claim cannot be dismissed on the basis of the gist of the

action doctrine at this time.

### ii.       Count IX – Conversion

Dr. Erbe argues that the conversion claim in Count IX must be dismissed under the gist of

the action doctrine because the employment agreement subsumes it as well.  Orthovita alleged in

Count IX that Dr. Erbe "unlawfully and willfully converted for his own use Orthovita's

confidential information, propriety information and trade secrets," and that, as a result, he has

realized or will realize profits from the conversion.  Amended Compl. ¶¶ 191-92.  Dr. Erbe

asserts that "the duty to maintain confidentiality, and to refrain from disclosure of sensitive

information, is imposed by the parties' contract...preventing Plaintiff's attempt to recast the claim

as one sounding in tort."  Motion at 8.

When a plaintiff has a property interest in the thing that is the subject of a conversation

claim, the gist of the action doctrine does not bar recovery under a conversion theory even though

the property may also be the subject of a contract.  <u>See</u>, <u>Berger</u>, 153 F. Supp. 2d at 753-54

(holding that conversion claim was not barred when plaintiff had property interest in proceeds that were both the subject of the breach of contract and conversion claims).  Orthovita has alleged that it has a property interest in its trade secrets, confidential information and computer files.  That property properly can be the subject of both a breach of contract claim and a conversion claim.

Of course, even if the gist of the action doctrine could be used here, ultimately, the broad federal pleading possibilities allow the company to *plead* both causes of action as alternative theories of liability.  See, Berger, 153 F.Supp. 2d at 754 ("[As Rule 8(e)(2)] **allows [a plaintiff] to plead two or more alternative claims against [a defendant] for either breach of contract or conversion, regardless of their consistency, and whether based on legal, equitable or other grounds, Defendant's motion to dismiss the claim for conversion must, at this juncture, be denied.").  Accordingly, at this stage in the litigation, Orthovita may pursue the alternative claims for breach of contract and conversion.**

**iii.      Counts X and XII – Breach of Fiduciary Duty and Breach of Duty of Loyalty**

**Dr. Erbe argues that the claims for breach of fiduciary duty (Count X) and breach of duty of loyalty (Count XII) also must be dismissed under the gist of the action doctrine. He acknowledges that "superficially, these claims rest upon alleged duties imposed by law as a matter of social policy," but as framed in this case, Dr. Erbe emphasizes that "the breaches alleged...are all breaches for specific duties contained in the contract."  Motion at 9.  Paragraph 2.0 of the employment contract restricts the use of confidential information while paragraph 3.0 addresses Dr. Erbe's duty to refrain from competing with the company.  See, Amended Compl., Ex. A.  Thus, according to Dr. Erbe, breaches of the**

fiduciary duty and of the duty of loyalty are properly considered breaches of the employment contract.

Assuming that as an officer of the company Dr. Erbe owed a fiduciary duty to his employer,[6] Orthovita asserts that the duty extends well beyond the limited obligations of the employment contract.  The Third Circuit Court of Appeals held in <u>Bohler-Uddeholm Am., Inc. v. Ellwood Group Inc.</u>, 247 F.3d 79 (3d Cir. 2001), that obligations arising under a fiduciary duty are imposed "as a matter of social policy, rather than by mutual consensus."  <u>Id.</u> at 105.  Such "larger social policies [are] embodied in the law of torts rather than the terms of the contract."  <u>Id.</u>

Although Dr. Erbe asserts that Orthovita is seeking redress for his alleged misuse of confidential information and his supposed breach of his duty not to compete with his former employer, the Amended Complaint asserts a broader cause of action under the breach of fiduciary duty claim, including generalized harm from "acts and omissions." Amended Compl. ¶ 201.  Because the Court must view all well-pleaded allegations in the Amended Complaint in the light most favorable to Orthovita at this time, the Court finds that the gist of the breach of fiduciary duty claim is the tort ascribed to Dr. Erbe's failure to abide by the social policy embracing an employee's fiduciary duty, not the collateral (in this specific aspect of the dispute) employment contract.[7]

Similarly, a claim for breach of the duty of loyalty is defined by "larger social policies embodied in the law of torts."  So long as such fiduciary duties extend beyond the

---

[6]<u>See</u>, <u>infra</u>, § III.E.

[7]<u>But</u> <u>see</u>, <u>infra</u> § III.E.

limits of an employment contract due to the parties' relative positions, the gist of the action doctrine will not bar a claim for breach of loyalty.  See, e.g.,  Murphy v. Mid East Oil Co., 2007 WL 527715, at *6-7 (W.D. Pa. Feb. 14, 2007).  As an officer and agent of the company, any duty of loyalty owed by Dr. Erbe to Orthovita would flow from the parties' positions, not merely the terms of the employment contract.  The gist of the action doctrine does not bar such claims.

  iv.  Count XIII – Fraud

  Dr. Erbe maintains, essentially without explanation, that the Court should dismiss the fraud claim under the gist of the action doctrine.  Dr. Erbe merely states that the fraud claim encompasses the same breaches of loyalty as those alleged in Counts X and XII.

  Orthovita argues that because Dr. Erbe fraudulently misrepresented that he remained a loyal employee, the company did not terminate his employment but continued to allow him to participate in meetings involving Orthovita's business strategy.  See, Amended Compl. ¶¶ 234-35.  The company alleges that Dr. Erbe affirmatively took steps to hide his plot to steal Orthovita's secrets and proprietary information, thus deliberately harming the company.  Id. ¶ 44.

  Pennsylvania courts "generally invoke the gist of the action doctrine to bar a tort claim where the defendant has negligently or intentionally breached a contract."  Greater Philadelphia Health Servs. II Corp. v. Complete Care Servs., L.P., 2000 WL 33711052, at *2 (Pa. Com. Pl. Nov. 20, 2000).  However, courts have not invoked the doctrine to bar tort suits "when the defendant not only breached the contract, but also made representations about the breach with the intent to deceive the plaintiff, such that the unsuspecting plaintiff

continued the contractual relationship or failed to assert its contractual rights against the defendant." <u>Id.</u>  <u>See also</u>, <u>Am. Guarantee & Liab. Ins. Co. v. Fojanini</u>, 90 F.Supp.2d 615, 623 (E.D. Pa. 2000) (holding that plaintiffs' fraud claim was not barred by the gist of the action doctrine because plaintiffs "were duped into spending large amounts of time and energy on [defendant's] behalf in reliance upon representations made by [defendant] that [it] had its financial house in order."); <u>Northeastern Power Co. v. Balcke-Durr, Inc.</u>, 1999 U.S. Dist. LEXIS 13437, *37 (E.D. Pa. 1999) (holding that the gist of the action doctrine does not bar plaintiff's tort claim because the fraud claim went beyond mere failure to perform under the contract and asserted that defendant made "specific promises and representations that were allegedly made knowingly and/or recklessly with the intent to deceive and defraud [the plaintiff]").

Because Orthovita expressly asserts that Dr. Erbe made misrepresentations which resulted in his continued employment and access to proprietary information, such facts, if proven, are analytically separate from the breach of the contract claim itself.[8]  Orthovita's fraud claim against Dr. Erbe reaches beyond the bounds of the employment contract and will not be dismissed on the basis of the gist of the action doctrine.

---

[8] Dr. Erbe has cited <u>Interwave Tech. Inc. v. Rockwell Automation, Inc.</u>, 2005 U.S. Dist. LEXIS 37980 (E.D. Pa. 2005).  That case dealt with both fraud in the inducement of a contract and fraud that expressly overlapped a breach of contract claim.  Accordingly, the Court held that "for purposes of the motion to dismiss, the plaintiff must allege facts in the complaint that if proven, would amount to fraud in the inducement to enter into the contract, with such facts being analytically separable from allegations of breaches in the performance of the contract." <u>Id.</u> at *40.

In this case, as in <u>Interwave</u>, the fraud claim reaches beyond the confines of mere breach of contract (ever so slightly) due to Dr. Erbe's alleged fraudulent representations about his breach of the contract.  Accordingly, this claim can survive dismissal under the gist of the action doctrine, even as defined by the strict limitations of <u>Interwave</u>.

**B.     Counts II, III, IV and V – Misappropriation of Trade Secrets, Inevitable Disclosure, and Unfair Competition**

Dr. Erbe asserts that even if they survive application of the gist of the action doctrine, Orthovita's claims for misappropriation of trade secrets, inevitable disclosure, and unfair competition should be dismissed as non-viable.

Dr. Erbe first argues that the common law and statutory misappropriation claims must be dismissed because Orthovita asserts that Dr. Erbe disclosed trade secrets "to AST," but, as  Dr. Erbe notes, even Orthovita admits that AST is not yet a legal entity.  See, Amended Compl. ¶ 57.  However, Dr. Erbe neglects to address Orthovita's allegations that he disclosed trade secrets to potential AST consultants and investors.  Accordingly, even if Dr. Erbe could not have revealed information to a non-existent entity, he still could have misappropriated Orthovita information to reveal it to the individuals outside of Orthovita as identified in the Amended Complaint.

Dr. Erbe next argues that the Court should dismiss these counts because they lack specific supporting facts.  Dr. Erbe seeks to invoke Bell Atlantic Corp., et. al. v. Twombly, et. al., 127 S. Ct. 1955 (2007), a case concerning alleged Sherman Act violations in which the Supreme Court adopted a pleading standard to require that a complaint allege facts plausibly suggesting the existence of prohibited conduct, not merely consistent with such alleged conduct.  Id. at 1966.  A formulaic recitation of the elements of a cause of action is not sufficient under this standard.  Id.  In addition, Dr. Erbe again asserts that "no disclosure of trade secrets has taken place, as the only person or entity alleged to have received such disclosures is AST, an entity admitted not to exist."  Motion at 12.  Thus, he

again neglects to address the allegations that he revealed confidential information to specific individuals in preparation for the incorporation and development of AST.

Orthovita disputes the applicability of <u>Twombly</u>.  Indeed, while <u>Twombly</u> arguably raises the specificity standard for certain types of pleadings, it remains to be seen whether heightened pleading requirements will be demanded beyond the reach of the causes of action specifically at issue in <u>Twombly</u>.  At least one court in the wake of <u>Twombly</u>, when deciding whether a plaintiff has properly pled a claim for misappropriation of trade secrets, has continued to apply the same notice pleading standard for misappropriation claims rather than to require greater specificity.  <u>See</u>, <u>Givemepower Corp. v. Pace Compumetrics, Inc.</u>, 2007 U.S. Dist. LEXIS 59371, at *26 (S.D. Cal. Aug. 14, 2007) (finding that a plaintiff properly pled misappropriation claim and recognizing that so long as the complaint describes "the trade secret with sufficient particularity to separate it from matters of general knowledge...and to permit the defendant to ascertain at least the boundaries within which the secret lies...,one who seeks to protect his trade secrets from wrongful use or disclosure does not have to spell out the details of the trade secret to avoid a demurrer to a complaint.") (internal citations omitted).  Without commenting upon the possible propriety of applying <u>Twombly</u> beyond Sherman Act cases, the Court sees particularly cautionary reasons for declining to apply it here.  As Orthovita argues, a plaintiff alleging misappropriation of trade secrets need not plead the details of its trade secrets in a publicly filed complaint, inasmuch as such disclosure would destroy the essential "secrecy" of the claimed trade secret.  "[C]ourts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for

the simple reason that such a requirement would result in public disclosure of the purported trade secrets." Pennfield Precision, Inc. v. EF Precision, Inc., 2000 U.S. Dist. LEXIS 11971, at *10 (E.D. Pa. Aug. 15, 2000) (denying motion to dismiss trade secrets claim).

Using conventional pre-Twombly analysis, Orthovita also asserts that it has sufficiently pled the trade secrets at issue to survive a motion to dismiss these claims, as well as the inevitable disclosure claim and unfair competition claim. Orthovita has alleged that Dr. Erbe provided confidential information and trade secrets related to CORTOSS to potential AST investors during a series of presentations. See, Amended Compl. ¶¶ 54, 59, 60-65, 70-76, 79-80, 99-101. In addition, the company asserts that many of these potential investors are associated with Orthovita's direct competitors. Id. ¶¶ 65-66, 68, 71. Accordingly, the Court finds that Orthovita has met its threshold of pleading what types of trade secrets were revealed and to whom, thus meeting the applicable pleading requirements.

Dr. Erbe makes a final argument aimed at the dismissal of Orthovita's inevitable disclosure claim. He asserts that while Orthovita's repetition of the term "inevitable" may, at first glance, argue against dismissal at this time, in actuality, alleged inevitability is not sufficient to survive dismissal. The Amended Complaint does not allege that Dr. Erbe actually has taken employment with any competitor of Orthovita and does not allege what, if any, trade secret information Dr. Erbe is believed to have misappropriated. Accordingly, the Court perceives that what Dr. Erbe is arguing is that without some plausible, identifiable link to future conduct, empty allegations of inevitable disclosure should not

survive.  If this is what Dr. Erbe argues, on the surface there is much to recommend his logic.

However, Orthovita responds by noting that at this stage, the Court must take all of its allegations as true and thus may not rely solely on the absence of an allegation that Dr. Erbe is now actively employed with a competing company to dismiss the claim.  Orthovita asserts that under the inevitable disclosure doctrine it is entitled to bring claims to ensure that Dr. Erbe is unable to follow through on what might now only be a mere plan for an unincorporated entity.  Under the inevitable disclosure doctrine, a former employer is entitled to enjoin even *anticipated* employment or other business activity that would result in inevitable disclosure in order to protect the former employer's confidential and proprietary information from disclosure.  See generally, Air Prods. And Chems., Inc. v. Johnson, 442 A.2d 1114, 1119-20 (Pa. Super. Ct. 1982) (cited with approval by Sweetzl, Inc. v. Hawk Hill Cookies, 1995 U.S. Dist. LEXIS 13495, at *37-38 (E.D. Pa. 1995)).  Essentially, Orthovita is arguing that it should not have to wait for the fleeting moment in time when its ex-employee has signed on to a competitor's roster but before actual disclosure has taken place to file a claim because the "inevitable disclosure" cause of action exists so that the vulnerable ex-employer need not be so precariously poised and may file suit earlier in the sequence of likely inevitable events.  At least at this juncture, the Court agrees, and Orthovita's claim for inevitable disclosure survives.

As for Orthovita's claim for unfair competition, neither Dr. Erbe nor Orthovita addresses the legal requirements of such a claim.  In the Amended Complaint, Orthovita alleges that Dr. Erbe "wrongly and unfairly competed with Orthovita by creating AST

while still employed by Orthovita, revealing Orthovita's trade secrets and proprietary
information to AST and potential consultants for AST and investors in AST, and diverting
corporate opportunities to AST while employed by Orthovita." ¶ 148.  "If Dr. Erbe is
permitted to own and operate AST, or own, operate, consult or work for any other
biomaterials business, Orthovita will suffer irreparable injury that can only be avoided by
enjoining" Dr. Erbe from conducting such activities. Id. ¶ 152.  As far as the Court can
discern, these quoted allegations form the upshot of the unfair competition claim.

"A claim of unfair competition under Pennsylvania law requires proof that the
defendant has 'passed off' the goods of one manufacturer or vendor as those of another,
thus creating confusion between his own goods, and those of the rival."  Scanvec Amiable,
Ltd. v. Chang, 8 Fed. Appx. 171, 180 (3d Cir. 2003) (citing Penn. State Univ. v. Univ.
Orthopedics, Ltd., 706 A.2d 863, 870-71 (Pa. Super. Ct. 1998) ("The gist of the action lies in
the deception practiced in 'passing off' the goods of one for that of another")).  The
"underlying principle of law of unfair competition is to prevent substitution by deception."
Winthrop Chemical Co. v. Weinberg, 60 F.2d 461, 463 (3d Cir. 1932).  Accordingly, the
"law of unfair competition also requires that a company, entering a field already occupied
by a rival of established reputation, 'must do nothing which will unnecessarily create or
increase confusion between his goods or business and the goods or business of the rival.'"
Penn. State Univ., 706 A.2d at 870-871 (quoting Gamlen Chemical Co. v. Gamlen, 79 F.
Supp. 622, 636 (W.D. Pa. 1948)).[9]

---

[9] As has been alluded to above, Orthovita has presented no evidence that AST is an
independent business entity rather than simply Dr. Erbe's idea.  In fact, Orthovita admits in its
Amended Complaint that Dr. Erbe merely "plans to incorporate an entity called Augmented

In Count V of the Amended Complaint, by which Orthovita brings its unfair competition claim, Orthovita does not accuse Dr. Erbe of passing its goods off as his own or fostering confusion between his goods and those of his former employer.[10]  Orthovita simply accuses Dr. Erbe of misappropriation and misuse of its trade secrets and other confidential information.  Accordingly, Orthovita has failed to proffer allegations in the Amended Complaint sufficient to warrant relief for unfair competition under even the most generous reading of the Count that is meant to articulate that claim.

Therefore, Orthovita's claims for misappropriation of trade secrets and inevitable disclosure survive dismissal at this time.  Orthovita's claim for unfair competition is dismissed without prejudice should Orthovita properly seek leave to amend that Count.

C.     Counts VI and VII – Trademark Infringement and Violation of §32 of the Lanham Act

Dr. Erbe argues that Orthovita's trademark infringement claims must be dismissed because Orthovita has not alleged that AST has developed any products, much less that it is marketing such products.  In addition, Dr. Erbe claims that Orthovita's allegations

---

Spinal Technologies ("AST")."  Amended Compl. ¶ 57.  Accordingly, AST cannot yet be considered a company entering the field already occupied by Orthovita.

[10]Orthovita makes such allegations only in relation to its trademark infringement claims (Counts VI and VII).  If Orthovita wishes to pursue a claim for unfair competition based on Dr. Erbe allegedly using the Orthovita or CORTOSS names in such a manner "that people in the trade of the purchasing public perceive[d] the word or name as standing for the business of a particular company," see, Penn. State Univ., 706 A.2d at 871, then Orthovita would need to amend Count V to support such a reading of its unfair competition claim.  As stated currently, Orthovita's unfair competition claim fails to support such a reading.

regarding the AST PowerPoint[11] presentation demonstrate that any use of the CORTOSS

name in the document does not infringe on Orthovita's trademark because the use does not

cause likelihood of confusion and does not contain a false description of the origin of any

product.  See, Motion at 14.

Orthovita asserts that Dr. Erbe's use of the trademark CORTOSS in the AST

PowerPoint presentation violated trademark law, specifically 15 U.S.C. § 1125.  See,

Amended Compl. ¶ 154.  In addition, Orthovita alleges that Dr. Erbe "used an exact copy

or colorable imitation of the mark CORTOSS in connection with the sale, offering for sale,

distribution and/or advertising of his products and services, which is likely to cause

confusion, mistake and/or deceive members of the public in violation of 15 U.S.C. § 1114."

Amended Compl. ¶ 177.

Longstanding conventional case law holds that the essence of a trademark

infringement claim is the passing off of the goods of one as those of another.  See, Am. Steel

Foundries v. Robertson, 269 U.S. 372 (1925).  The elements necessary to establish

Orthovita's claims under Sections 1114 and 1125 of the Lanham Act are similar.  See, A&H

Sportwear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000). Pursuant

to 15 U.S.C. § 1114, "[t]o prove a trademark infringement, a plaintiff must show that: (1)

---

[11]Dr. Erbe requested that the Court consider the contents of the AST PowerPoint
presentation slides when ruling on the Motion to Dismiss.  Orthovita did not attach the
PowerPoint slides to the Amended Complaint (Docket No. 19), however, and Dr. Erbe did not
attach it to his Motion.  In fact, the PowerPoint slides were attached only to Orthovita's June 14,
2007 Motion for Leave to File Complaint and Other Documents under Seal (Docket No. 2).

It is well settled that "a district court ruling on a motion to dismiss may not consider
matters extraneous to the pleadings." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410
1426 (3d Cir. 1997) (citations omitted).  Accordingly, the Court did not consider the contents of
the AST PowerPoint.

the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services." <u>Fisions Horticulture, Inc. v. Vigoro Industries, Inc.</u>, 30 F.3d 466, 472 (3d Cir. 1994).  Under 15 U.S.C. § 1125(a), a plaintiff must show that (1) the mark is valid, legally protectable and owned by the plaintiff, and (2) the defendant's use of the mark to identify goods or services causes a likelihood of confusion concerning the origin of the goods or services.  <u>See</u>, 15 U.S.C. § 1125(a).

Dr. Erbe asserts that Orthovita makes only one specific allegation regarding the PowerPoint presentation: that he showed the presentation "to investors and potential investors and other medical advisors."  <u>See</u>, Amended Compl. ¶ 65.  Accordingly, Dr. Erbe argues that there is no allegation that the PowerPoint presentation has been used to market any products, so it is implausible that any potential investors were likely to be confused as to the origin of goods which did not yet exist.  Dr. Erbe argues that Counts VI and VII should be dismissed because "it is exceedingly implausible" that investors to whom he made his AST PowerPoint presentations about CORTOSS were "likely to be confused." Motion at 15.  However, he does not further elaborate.

In response, Orthovita notes that Dr. Erbe "does not challenge the fact that Orthovita has specifically alleged that it owns the CORTOSS mark, that the CORTOSS mark is valid and legally protectable, or that [Dr.] Erbe in fact used the CORTOSS mark in connection with a PowerPoint presentation to potential investors for a start-up competitive entity, AST."  Opposition at 16.  Assuming these allegations and all reasonable inferences arising therefrom as true, Orthovita urges the Court to find that Dr. "Erbe used

the CORTOSS mark without Orthovita's permission 1) in connection with the 'offering for sale' and 'advertising' of goods (in satisfaction of 15 U.S.C. § 1114); and 2) 'in connection" with goods in commerce (in satisfaction of 15 U.S.C. § 1125)."  Id.  See, BIEC Int'l, Inc. v. Global Steel Servs., Ltd., 791 F. Supp. 489, 537-38 (E.D. Pa. 1992) ("the Lanham Act explicitly prohibits [a defendant] from suggesting that its clients can pass their products off as what has become known in the industry [under a trademark].");  Software Publishers Assoc. v. Scott & Scott, LLP, 2007 U.S. Dist. LEXIS 2666, at *22 (N.D. Tex. Jan. 11, 2007) (use of mark in connection with business "for purposes of trading upon the goodwill" of mark is sufficient allegation of use in commerce to withstand a motion to dismiss).

The law does not require as a prerequisite to trademark infringement that goods already have been manufactured.  Section 1114 prohibits unauthorized use of a registered trademark "in connection with the sale, offering for sale, distribution, or advertising of goods or services."  15 U.S.C. § 1114.  Therefore, "[a]n offering to sell without more will suffice to establish liability."  Levi Strauss & Co. v. Shilon, 121 F.3d 1309, 1312 (9th Cir. 1997).  In fact, in Levi Strauss, the court upheld an injunction even where there was insufficient evidence to prove any goods had yet been produced or sold.  Id.  See also, Vuitton Et Fils S.A. v. Crown Handbags, 492 F. Supp. 1071, 1077 (S.D.N.Y. 1979) (because of possibility of injury to plaintiff, injunction is appropriate even if defendant has not yet sold any infringing goods).

Orthovita directs the Court to the BIEC case where the defendants left their former employer to form a competing entity that advertised the flag-ship product of their former employer in an effort to mislead consumers about the source of that product.  791 F. Supp.

-25-

at 534-37.  **Instead of suggesting that they could manufacture a product like that of their former employer, the defendants asserted they could manufacture the exact product.  Id. at 537.  The defendants distributed the promotional materials only weeks after leaving the plaintiff company's employ and well before they had the opportunity to manufacture any products.  Id.  The BIEC court found that the misleading references to the former employer's product warranted a preliminary injunction.  Id. at 538.**

**Orthovita argues that it is not unreasonable to assume that presentations asserting that Dr. Erbe was authorized to sell CORTOSS or a CORTOSS-like product were certainly likely to confuse viewers.  "There is nothing inherently implausible about the Chief Science Officer...of a company claiming to have the right to sell a product offered by his company.  Nor is it inherently implausible that a departing Chief Science Officer might have the blessing of his former employer to promote one of his former employer's products."  Opposition at 18-19.  To believe Dr. Erbe's attack on the claim is to presume that the viewers of his presentation could not be confused about the "origin, source, sponsorship or approval of Erbe's bioactive bone augmentation materials."  Id. at 19. Because at this stage in the litigation the Court must take as true all well-pleaded allegations, the Court will not substitute its own evaluation of the presentation or opine as to whether someone may or may not have been confused.  The plausibility or implausibility of these conclusions will surely be determined or at least aided by discovery.  Accordingly, as to the question of whether there are a set of facts under which relief could be granted to Orthovita for the trademark claims, the Court finds that there are.**

**D.     Count VIII – Promissory Estoppel**

Dr. Erbe asserts that the Court must dismiss Orthovita's promissory estoppel claim because Orthovita has pled a breach of contract claim that seeks the same relief.  Count I of the Amended Complaint asserts a claim for breach of contract and incorporates Exhibit A, a copy of the written employment contract between Orthovita and Dr. Erbe.  <u>See</u>, Motion at 15.

Through the doctrine of promissory estoppel, a promise that is not supported by consideration may be enforced by the courts to "remedy a manifest injustice." <u>Cardamone v. University of Pittsburgh</u>, 384 A.2d 1228, 1233 (Pa. Super. Ct. 1978).  Promissory estoppel should not be used to supplement or modify a written, enforceable contract.  The doctrine applies in situations where parties failed to satisfy the "formal requirements of contract formation...and where justice would be served by enforcing a promise." <u>Carlson v. Arnot-Ogden Memorial Hosp.</u>, 918 F.2d 411, 416 (3rd Cir. 1990).  Logically, a promissory estoppel claim can proceed only where a contract is absent. <u>Iverson Baking Co., Inc. V. Weston Foods, Ltd.</u>, 874 F.Supp. 96, 102 (E.D. Pa. 1995) ("[I]f the courts finds that a contract exists, the promissory estoppel claim must fail.") When parties have formed an enforceable contract, "relief under a promissory estoppel claim is unwarranted."  <u>Carlson v. Arnot-Ogden Memorial Hosp.</u>, 918 F.2d 411, 416 (3d Cir. 1990).  However, it is permissible to plead breach of contract and promissory estoppel in the alternative.  <u>See</u>, <u>MLEA, Inc. v. Atl. Recycled Rubber, Inc.</u>, 2005 U.S. Dist. LEXIS 42260, at *12 (E.D. Pa. May 19, 2005).  Thus, the promissory estoppel claim must fail only if and when the court finds that a valid contract exists.  <u>Id.</u>

Orthovita certainly has pleaded the existence of an employment agreement, and at oral argument this counsel explained candidly that Dr. Erbe does not deny its existence. On this basis, and assuming no issues contrary to these fundamental facts, the promissory estoppel claim likely will not survive.  See, Lim v. New York Life Insur. Co., 1998 U.S. Dist. LEXIS 318, at *3 (E.D. Pa. January 13, 1998) (holding that a promissory estoppel claim could not survive a motion to dismiss where a plaintiff plead the existence of a contract, and the defendant did not deny its existence).  However, Dr. Erbe has expressed in his motion papers an intent to challenge the *scope* of the employment contract.[12]  The Court also notes that Dr. Erbe has not yet answered the Amended Complaint or raised whatever affirmative defenses he intends.  Accordingly, the contract may not provide for all promises at issue in this case.  See, Kraus Indust. v. Moore, 2007 U.S. Dist. LEXIS 68869, at *25 (E.D. Pa. September 18, 2007) (the existence of a contract will not bar a promissory estoppel claim "when the alleged promise is distinct from the original contract" (citation omitted)).

Because it is permissible to plead breach of contract and promissory estoppel in the alternative, and it is not yet ascertainable whether the parties agree on the scope of the employment contract or the contours of the parties' dispute, the promissory estoppel claim survives dismissal.

E.    Count X – Breach of Fiduciary Duty

Orthovita asserts that Dr. Erbe breached his fiduciary duty to the company while

---

[12]See, Motion at 13 n.5.

acting as an officer and an agent of Orthovita.  Amended Compl. ¶ 39.  Dr. Erbe counters

that the Court should dismiss the breach of fiduciary duty claim (Count X) because

Pennsylvania law does not strictly impose a fiduciary duty on corporate officers or

employees, but rather imposes such a duty only on corporate directors.  (Motion at 16-17.)

     In support of his position, Dr. Erbe cites Pennsylvania Business Corporation Law,

15 Pa.C.S. § 512, which sets forth the relative, but arguably different, duties of corporate

officers and directors under Pennsylvania law.  As for the duties for directors and officers,

the statute provides as follows:

> § 512 Standard of care and justifiable reliance
>     (a) DIRECTORS.– A director of a domestic corporation shall stand in a
> fiduciary relation to the corporation and shall perform his duties as a director...in
> good faith...and with such care...as a person of ordinary prudence would use under
> similar circumstances.
>     ***
>     (c) OFFICERS.–Except as otherwise provided in the articles, an officer shall
> perform his duties as an officer in good faith, in a manner he reasonably believes to
> be in the best interests of the corporation and with such care, including reasonable
> inquiry, skill and diligence, as a person of ordinary prudence would use under
> similar circumstances....

15 Pa.C.S. §§ 512(a), (c).

     Orthovita quotes a portion of the "Fiduciary Duty" section of the Chapter of

Domestic Business Corporations Law relating to "Officers, Directors and Shareholders,"

15 Pa.C.S. § 1712, in an attempt to challenge Dr. Erbe's position.  That section reads:

> Officers. – Except as otherwise provided in the bylaws, an officer shall perform his
> duties as an officer in good faith, in a manner he reasonably believes to be in the
> best interests of the corporation and with such care, including reasonable inquiry,
> skill and diligence, as a person of ordinary prudence would use under similar
> circumstances.  A person who so performs his duties shall not be liable by reason of
> having been an officer of the corporation.

Id.  This quoted portion, which concerns officers, uses nearly identical language to that

-29-

found in 15 Pa.C.S. § 512, and thus lacks any direct mention of a "fiduciary relationship." Orthovita did not include the portion of the statute regarding directors, which also uses nearly identical language as that in 15 Pa.C.S. § 512, and thus does include the phrase "fiduciary relationship.  Pennsylvania courts have explained that 15 Pa.C.S. § 1712(a) "imposes a fiduciary duty on a corporate director while Section 1712(c) provides that a corporate officer must act 'in good faith.'" <u>Santoro v. Morse</u>, 781 A.2d 1220, 1231 (Pa. Super. Ct. 2001). <u>See also</u>, <u>Village of Camelback Property Owners Assoc., Inc. v. Carr</u>, 371 Pa. Super. 538 A.2d 528, 536 (Pa. Super. 1988).

Nonetheless, Orthovita endeavors to bolster its position by citation to <u>Seaboard Indus., Inc. v. Monaco</u>, 276 A.2d 305, 308 (Pa. 1971) ("The controlling principles of equity are well settled.  Officers and directors of a corporation are deemed to stand in a fiduciary relation to the corporation."). However, <u>Seaboard</u> deals with another section of Pennsylvania law entirely, namely, 15 P.S. § 1408, which is no longer Pennsylvania law.

Dr. Erbe, as an officer who is not a director of the corporation, had no fiduciary duty to Orthovita under Pennsylvania law.  Accordingly, Orthovita's claim in its Amended Complaint for breach of fiduciary duty is not a claim upon which relief could be granted.

**IV.    CONCLUSION**

For the reasons set forth above, the Court denies the Motion to Dismiss as to Counts

**II-IV, VI-VIII, IX, and XII-XIII, grants the Motion as to Count X (Breach of Fiduciary**

**Duty) and grants the Motion as to Count V (unfair competition), all as set forth above.**

 

**An appropriate Order consistent with this Memorandum follows.**

**BY THE COURT:**

**S/Gene E.K. Pratter**
**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ORTHOVITA, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| | : | NO. 07-2395 |
| v. | : | |
| | : | |
| ERIK M. ERBE, | : | |
| | : | |
| Defendant. | : | |

## ORDER

AND NOW, this 14th day of February 2008, upon consideration of Defendant's Motion to Dismiss (Docket No. 22), Defendant's Brief in Support of the Motion to Dismiss (Docket No. 23), and Plaintiff's Response in Opposition (Docket No. 26), as set forth in the accompanying Memorandum, IT IS HEREBY ORDERED that the Motion is GRANTED as to Count X (breach of fiduciary duty), GRANTED as to Count V (unfair competition), and DENIED as to Counts II-IV, VI-VIII, IX, and XII-XIII.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

-32-